## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN GLENN,                        :
    Plaintiff,                     :
                           :      CIVIL ACTION
           v.                 :
                           :      NO. 10-CV-816
RAYMOUR AND FLANIGAN,                 :
    Defendant.                     :
                           :
                           :
                           :
                           :
                           :

December _22,  2011                                   Anita B. Brody, J.

## <u>MEMORANDUM</u>

Plaintiff Stephen Glenn ("Plaintiff" or "Glenn") has brought suit against his former

employer, Raymour and Flanigan ("Defendant" or "Raymours"), for disparate treatment,

retaliation, and hostile work environment under 42 U.S.C. § 1981; Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Cons. Stat. § 95 *et seq.*[1]  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331,

1343, and 1367.  Defendant has filed a motion for summary judgment.  For the reasons set forth

below, I will grant Defendant's motion.[2]

---

[1] The legal standards for analyzing Glenn's Title VII, 42 U.S.C. § 1981, and the PHRA claims are
the same for purposes of summary judgment.  <u>Jones v. Sch. Dist.</u> 198 F.3d 403, 409 (3d Cir.
1999).  Therefore, in addressing the merits of those claims, this opinion will only reference Title
VII because any result reached under it applies equally to Glenn's claims under 42 U.S.C. § 1981
and the PHRA.

[2] If this case were to go forward, it would be tried by a judge, considering that Glenn explicitly
and voluntarily waived his right to jury trial when he signed his employment application with

# I. BACKGROUND[3]

## A. Glenn's Hiring and Promotion at Raymours

On July 24, 2007, Raymour and Flanigan, a furniture company, hired Glenn, an African-American male, as a Facility Technician in its Frazer, Pennsylvania service center ("Frazer Service Center"). Upon being hired, Glenn received a copy of Raymour's "Associate Handbook" and confirmed in writing that he understood its contents. The Associate Handbook identified a non-exhaustive list of actions and conduct that might "result in disciplinary action up to and including termination . . . ." Def.'s Mot. Summ. J. Ex. 9. This list included the following conduct:

- "Rude, abusive, or obscene language or conduct on company property."
- "Fighting or disorderly conduct."
- "Harassing, interfering with, or refusing to cooperate with coworkers in the performance of their duties."
- "Threats of harm directed to a . . . co-worker . . .on Company property . . . ."

Id.  Glenn also understood that Raymours had a policy against harassment and discrimination in the workplace. This policy was communicated to the employees at the Frazer Service Center in at least five distinct ways—(1) in a discussion upon hiring, (2) Professional Conduct and Harassment Awareness training and an accompanying handout, (3) in the Associate Handbook,

_____

Raymours.  See Great Western Morg. Corp. v. Peacock, 110 F.3d 222, 226-27 (3d Cir. 1997) (holding that arbitration agreement in employment contract is enforceable).

[3] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (internal quotations omitted).  Where facts are disputed, Glenn's account of the facts will be taken as true for the purposes of this motion.

(4) through signing an acknowledgment form, and (5) through workplace posters placed outside the employee break room.

The Frazer service center is divided into several different departments, including Operations, Delivery, Customer Care, and Internal Controls. Each department has its own manager. During the relevant time period, the Operations Manager was Don Hazeldine, and the Delivery Manager was Eric Delaney. Both Hazeldine and Delaney reported to Chris Saporito, the Regional Director of Operations, who oversaw the Operations, Delivery, and Internal Controls Departments at the Frazer Service Center.

As heads of their respective departments, Hazeldine and Delaney were responsible for their department's supervisors; those supervisors in turn oversaw their subordinates in each department. In the Operations Department, the subordinates included Facility Technicians and Customer Delivery Inspectors. In the Delivery Department, the subordinates included Customer Delivery Experts (drivers) and Customer Delivery Assistants (helpers). Department managers were responsible for the hiring, supervision, promotion, discipline, and firing of their employees. Hazeldine interviewed Glenn for the Facility Technician position and made the decision to hire him.

When Glenn first began working at Raymours, he was on the night shift. Being on the night shift increased his pay rate over that of the day shift employees. Sometime in the fall of 2008, after Glenn expressed interest in moving to the day shift, Hazeldine made the decision to approve Glenn's transfer to the day shift. Hazeldine allowed Glenn's pay rate to remain the same, even though it was supposed to decline as a result of the transfer. Glenn considered this transfer "like a promotion in itself."

After his transfer to the day shift, Glenn was occasionally able to perform the duties of a Customer Delivery Inspector ("CDI").  He liked the duties of a CDI and informed his Operations Supervisor, Robert Mirth, that he was interested in a promotion to that position.  Mirth subsequently recommended Glenn for a CDI position, and Hazeldine promoted Glenn to the position effective January 21, 2008.  The CDI promotion enabled Glenn to receive more in wages for less hours of work than his previous position.

Up until March 20, 2008, Glenn was generally satisfied with working at Raymours.  He felt he was treated fairly and had no problems with anyone at the company.  He testified that he had no reason to believe that anyone at Raymours discriminated against him or harassed him prior to March 20, 2008.  On March 20, 2008, however, an altercation between Glenn and a co-worker, Steven Faust, led to Glenn's termination and his filing this action.

**A.  The Glenn-Faust Altercation**

Glenn and Faust, both CDIs for Raymours, worked in areas adjacent to one another.  On March 20, 2008, while at their respective work areas, they got into a dispute about a box of trash—each man pushing the box into the other's work area claiming that it was not his trash. Exactly what was said during the ensuing heated argument is the subject of some dispute.  At some point during the argument, however, Faust began walking toward Don Hazeldine's office to report the incident.  Hazeldine was in his office at the time, along with Robert Mirth and Nicole Corson, another Operations Supervisor.  From Hazeldine's office, Hazeldine, Mirth, and Corson observed Glenn following Faust, flailing his arms, and yelling the words "pussy" and "faggot" at Faust.  Faust eventually entered Hazeldine's office, and the door was closed.  Glenn

tried to open the door to follow Faust into the office, but it was closed on him.  He went back to his line and started finishing his work.

While in the office, Faust informed Hazeldine, Mirth, and Corson that he and Glenn had been arguing over a trash box and that Faust had told him that they should "step outside," at which point Faust went to Hazeldine's office.  Mirth subsequently left Hazeldine's office to discuss the matter with Glenn.  When Mirth left, Faust continued to talk to Hazeldine and Corson about the incident.  He alleged that Faust had threatened to "kick [his] ass" and called him a "pussy" and a "faggot."  Faust admitted that he called Glenn a "pussy" as well, to which Glenn responded, "Be a man, let's take this outside."  Faust explained that he came to Hazeldine's office because he did not want to lose his job over fighting.

Glenn, meanwhile, had been at his line working for a "few minutes" when Mirth approached him.  During their conversation, Mirth asked Glenn if he threatened Faust, and Glenn denied having done so.  Mirth then asked if Glenn had told Faust to "step outside," as Faust had alleged, and Glenn admitted that he had.  Mirth asked Glenn if he knew that was a threat, and Glenn said he did not.  Mirth subsequently informed Glenn that he could get fired for such a statement.  Glenn testified that at this point he "paused and kind of realized that [he] might be getting fired . . . ."  Glenn Dep. 190:14-16.  He asked Mirth "what [he was] going to do."  Glenn Dep. 190:16-17.  Glenn failed to provide any other information on the altercation to Mirth.  Mirth instructed Glenn to wait by the time clock until he returned.

When Mirth got back to Hazeldine's office, Hazeldine asked Faust to leave the office.  He then asked Mirth and Corson what they thought should be done about the situation.  Mirth recommended that Glenn be terminated because he committed a serious violation of the

company's workplace policies, based on the behavior he observed and Glenn's admission that he

invited Faust to "step outside" during their argument.  Corson agreed with this recommendation.

After listening to Mirth and Corson, Hazeldine decided to terminate Glenn's employment.  He

then called Chris Saporito, the Regional Director of Operations, to inform him of his decision.

Saporito told Hazeldine that if he was going to terminate Glenn, he needed to ensure that he be

escorted off the premises immediately.  Mirth returned to Glenn and told him to punch out for the

day because he was terminated.  Glenn "pleaded" with Mirth and asked if he could speak to the

human resources representative for Raymours, Latasha Lane.  Mirth told him he could not and

then escorted him off the property.

In a "Disciplinary Counseling" form created that same day, Mirth documented the

termination and noted that Glenn "was terminated for creating a hostile work environment and

making threats to another associate."  Def.'s. Mot. Summ. J. Ex. 19 at P01014-0105.

**B.  Glenn's Explanation of the Faust Incident and Faust's Written Reprimand**

When Glenn arrived back at his home that same day, he called Latasha Lane.  Lane

instructed him to write down what happened and fax it to her.  Glenn faxed a letter, dated March

20, 2008, the next day on March 21, 2008.  In this letter, Glenn offered his description of the

incident with Faust.  According to Glenn, while he and Faust were pushing the trash box back

and forth from their respective work areas, Faust said to him**,** "Boy, don't put your box back on

this line."  Glenn then responded, "Don't call me boy."  Faust called him "boy" again.  At that

point, Glenn got "excited" and started calling Faust names like "homo, faget [sic], etc."  As both

men were "name calling," Glenn retorted "say it to my face."  Faust approached Glenn, face-to-

face, and said, "Go ahead, do it . . . I'm not getting fired."  At that point, Faust began walking

back to Hazeldine's office.  As Faust was walking, he said to Glenn, "I see stupid written all over your face."  Glenn responded, "Step outside then!"[4]  In his letter, Glenn admitted this comment was "inappropriate."  However, he also believed Faust's "boy" comment was a "racial statement," and he could not understand "why nobody asked me what happen [sic]."  He claimed that all he "was asked was if [he] said step outside or not."

In his deposition, when asked why he failed to tell Rob Mirth that Faust had called him a "boy," Glenn said: "Honestly, I didn't say anything because I figured if they don't want to take the time to hear my side of the story to begin with, why would that matter? Why would they want to know that."  Glenn Dep. 190:23-191:3.  He further testified:

> I don't know why I didn't [tell Mirth about the "boy" comment] . . . I didn't feel that comfortable saying that to Rob [Mirth].  I kind of felt like, like the way he came out, he didn't come out and ask me, you know, like what happened, or, you know, like what's going on.  He didn't say anything.  All he said was, basically, did I threaten Steve, you know.  So I took that to believe that . . . Steve [Faust] got, he expressed his side of the story.  And being that he expressed it to Don and whatever other supervisors were in the office, and I wasn't given the same common courtesy . . .  I honestly felt like it wouldn't matter to him.  You know, like if I said it or not.  It seemed like he had his mind made up.  As far as if he asked me did I say step outside and I said yes, then his mind was made up as far as I was concerned.

Glenn Dep. 191:12-192:6.  He acknowledged that Mirth never told him that his mind was made up.

As a result of Glenn's alleging that Faust made a racial statement, Lane told Hazeldine and Mirth to obtain a written statement from Faust on the issue.  In his statement, Faust stated that in response to Glenn saying, "Be a man, let's take this outside," he said, "I am a man, you're

---

[4]In his deposition, Glenn testified that he "kept saying" to Faust, "step outside and say that" and "you wouldn't say that if you was [sic] outside."

acting like a boy."  Faust also stated that he did not realize the use of the word "boy" in an

argument could be interpreted as a racial statement.  Hazeldine and Mirth found Faust's

statement credible.  Hazeldine did decide, however, to issue a written warning to Faust.  The

warning noted that even though Faust was "correct" to "report[] the situation prior to further

escalation," he could have brought the incident to the attention of management sooner, and that

by "name calling he actually contributed in the creation of a hostile work environment."  Def.'s

Mot. Summ. J. Ex. 18.

### C.  Alleged Copperthwaite-Adams Fight

On some day prior to Glenn's termination, Robert Dye, an Operations Supervisor, claims

to have witnessed "the back end" of an altercation between two Caucasian Raymours employees,

Liam Copperthwaite and Mike Adams, on Raymours' premises.   He did not see any punches

thrown, but observed from a distance some individuals "separating the two of them," with

Adams trying to "pursue" Copperthwaite and saying "if you ever do that again, I'll snap your

F'ing [sic] neck."  Adams and Copperthwaite worked in the Customer Delivery Department

under Eric Delaney, a Customer Delivery Manager.  Dye testified that he asked Delaney about

the incident on the day it happened and that Delaney told him he would "take care of it."  Dye

failed to tell Delaney that he heard Adams say "I'll snap your F'ing [sic] neck" to Copperthwaite.

Dye does not know whether any Raymours manager saw the alleged scuffle.  Delaney testified

that he did not see or learn about the alleged scuffle until Lane informed him about it in a

meeting in Chris Saporito's office.  Upon learning this information from Lane, Delaney

interviewed Adams that same day about the matter, and he interviewed Copperthwaite the next

day.  He then interviewed them both for a second time a couple days later.  They both denied

having been in any sort of altercation.  Delaney did not conduct any more formal interviews, but

did informally ask around to others to see if they might have seen anything.  Dye informed Glenn

of this alleged incident after Glenn's termination.

**D.  Cynthia Stinson**

Cynthia Stinson was a Raymours employee from 2005 until April 2008.  During the

relevant time period, she worked as a parts coordinator and reported to the Customer Care

Manager, Jerry O'Leary.  In January 2008, Stinson reported to O'Leary that an ordering form had

been left on her desk with the word "NIGER" and the letters "NGR" written at the end of an

ordering code.  On the same day, Lane interviewed Stinson for almost an hour in an attempt to

determine which individual produced the ordering form.  Neither Stinson nor Lane had any idea

as to who could have written the form.  Lane subsequently worked with her supervisor Kate

Cilurso, Raymours' Human Resources Manager, to review the time records of the employees at

the Frazer facility during the time period in which the ordering form could have been written.

Based on their review of the relevant time period, they determined that too many employees were

working in the facility and could have had access to the form, to be able to establish the writer of

the form.  As a result, Lane met with managers and supervisors at the Frazer facility, reviewed

the company's anti-harassment policy with them, and suggested that they review the policy with

all their associates and have them sign off on it.  On the day Stinson reported the incident,

O'Leary held a meeting with all Customer Care employees, including Stinson, in which he

reviewed each point of the anti-harassment policy and had the employees read the policy as well.

Stinson's experience while working at Raymours was "totally fine" with the exception of

this incident.  She ended up leaving Raymours in April 2008 because of the incident and the

manner in which Raymours handled it.  In her deposition, she testified: "I didn't think they would

find the person, but it would have made me feel better if they would have done something other

than having a meeting and having everyone sign [the anti-harassment] policy."  Yet she also

testified that she did not know whether Raymours had reviewed the time records to see if they

could narrow the list of potential suspects.  When asked if she still would have left Raymours if

she had known this work had been done, she replied, "I don't think so."

**D.  Glenn's Complaint**

On July 15, 2008, Glenn dual-filed a complaint with the Pennsylvania Human Relations

Commission and the Equal Employment Opportunity Commission.  On March 1, 2010, Glenn

filed a complaint in this court, asserting claims for disparate treatment, retaliation, and hostile

work environment under 42 U.S.C. §§ 1981, Title VII, and the PHRA.  On May 20, 2011,

Raymours filed a motion for summary judgment as to all Glenn's claims.

**II. LEGAL STANDARD**

Summary judgment will be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . .

."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if

the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  Id.

The moving party bears the initial burden of demonstrating that there is no genuine issue

of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The nonmoving party must

then "make a showing sufficient to establish the existence of [every] element essential to that

party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  In ruling

on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims.  Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

## III. DISCUSSION

Raymours moves for summary judgment on all of Glenn's claims.  As an initial matter, although Glenn's complaint asserts claims of hostile work environment, "harassment," and retaliation under Title VII, 42 U.S.C. § 1981, and the PHRA, Raymours argues that "despite the *pro forma* language in Plaintiff's Complaint referencing 'harassment' and 'hostile work environment,'" Glenn cannot establish a prima facie hostile work environment or "harassment" claim.[5]  In response, Glenn fails to even mention his "harassment," hostile work environment, or retaliation claims in his brief, much less establish his prima facie case for them.[6]  Therefore, I

---

[5]Raymours points out that until the events of March 20, 2008, Glenn explicitly disclaimed the existence of any other discriminatory events in connection with his employment.  It emphasizes that, therefore, he fails to have a viable "harassment" or hostile work environment claim, which requires proof of conduct "so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive work environment."  Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001).

[6]Although Raymours fails to specifically discuss Glenn's retaliation claim, the record lacks any evidence whatsoever that could raise a genuine issue as to whether Glenn engaged in a protected activity prior to or contemporaneous with his termination.  Marra v. Phila. Hous. Auth., 497 F.3d

deem Glenn to have abandoned these claims by failing to address them in his response to Raymours' motion for summary judgment.  Seals v. City of Lancaster, 553 F.Supp. 2d 427, 432-33 (E.D. Pa. 2008); Hackett v. Cmty. Behavioral Health, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005) (failure to address claims waives opportunity to contest summary judgment on that ground).

Glenn also asserts a claim of disparate treatment under Title VII, 42 U.S.C. § 1981, and the PHRA, alleging that Raymours terminated him because of his race. It is on this claim that the parties' briefs focused almost exclusively.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or natural origin."  42 U.S.C. § 2000e-2(a)(1).

Title VII disparate treatment claims may be proven by direct or indirect evidence.  Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).  Here, Glenn offers only indirect evidence of race discrimination in Raymours' decision to terminate his employment. Thus, his claim must proceed through the three-step burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff must establish a prima facie case of discrimination.

**A.  Prima Facie Case**

------------------------

286, 300 (3d Cir. 2007) (holding that part of a prima facie case of retaliation requires a showing that the plaintiff suffered "an adverse action by the employer either after or contemporaneous with the employee's protected activity").  And again, Glenn failed to mention any aspect of his retaliation claim in his response.

In order to establish a prima facie case of disparate treatment under Title VII, a plaintiff must show the following: "(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was . . . fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class." Jones v. Sch. Dist. 198 F.3d 403, 410-11 (3d Cir. 1999).  As an alternative to the fourth prong, a plaintiff may show "that similarly situated individuals outside the plaintiff's class were treated more favorably [than he]."  Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 273-74 (3d Cir. 2010) (citing Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 939-40 (3d Cir. 1997)) (citation omitted).

For purposes of the summary judgment motion, Glenn has satisfied the first three steps of his prima facie case—he is a member of a protected class, is qualified for his Customer Delivery Inspector position, and was discharged from that position by Raymours.[7]  Raymours asserts that Glenn has failed to establish the fourth element of his prima facie case—that the circumstances of his termination do not raise an inference of unlawful discrimination.  Specifically, Raymours argues that: (1) no causal connection exists between Glenn's race and his discharge, especially considering Glenn's employment history, and (2) Glenn has not shown that similarly situated non-protected individuals were treated more favorably than he.

_____

[7]Raymours argues that Glenn failed to establish the third step of his prima facie case because he is not challenging an adverse employment action, but rather the adequacy of Raymours' investigation of events surrounding Glenn's termination.  This is a misunderstanding of plaintiff's prima facie burden.  In establishing the third element of his prima facie case, Glenn need only show that he was discharged from a position for which he was qualified.  Jones v. Sch. Dist. 198 F.3d 403, 410-11 (3d Cir. 1999); Sheridan v. E.I. Dupont de Nemours and Co., 100 F.3d 1061, 1066 n.5 (3d. Cir. 1996) (en banc).  In this case, the fact that Glenn was discharged is undisputed.

13

To demonstrate the fourth element of his prima facie case, Glenn relies exclusively on circumstantial evidence purportedly showing that he was treated less favorably than three other similarly situated Caucasian employees—Steven Faust, Mike Adams, and Liam Copperthwaite.

To be "similarly situated," the plaintiff must show that "the other employee's acts were of 'comparable seriousness.'"  Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (quoting Lanear v. Safeway Grocery, 843 F.2d 298, 301 (8th Cir. 1988)).  "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'"  Opsatnik v. Norfolk Southern Corp., 335 Fed. Appx. 220, 223 (3d Cir. 2009) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)).  With regard to workplace discipline, the relevant factors to consider in determining whether individuals are "similarly situated" may include a "'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish the conduct of their employer's treatment of them.'"  McCullers v. Napolitano, 427 Fed. Appx. 190, 195 (3d Cir. 2011) (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)).

### *i.  Steven Faust*

Glenn argues that he is similarly situated to Faust because, in regard to their altercation on March 20, 2008, they both: (1) had the same supervisors, (2) "exchanged heated words and derogatory comments," and (3) "challenged [each] other to a fight."  Glenn asserts that Raymours then permitted Faust to explain his side of the story and only issued him with a written reprimand, while Raymours denied Glenn a similar opportunity and immediately terminated him.

14

Glenn is correct that both he and Faust have the same supervisor—Don Hazeldine, Operations Manager. Their similarities, however, end there. First, their misconduct was different. In the March 20 altercation, Glenn admitted that he repeatedly told Faust to "step outside." Faust did not make a similar threat to Glenn.[8] Both men did admit to calling each other "pussy"—and Raymours disciplined Faust for his use of the word—but Glenn further admitted to calling Faust a "homo" and a "faggot," the latter of which all three supervisors in Don Hazeldine's office heard.

Furthermore, Faust retreated from the altercation to report it to management. Unlike Faust, Glenn failed to report any aspect of the situation—except for later admitting that he told Faust to "step outside"—to Raymours' management. Although Glenn continually argues that Raymours deprived him of the opportunity to explain his side of the story, he conveniently ignores the fact that he had such an opportunity while discussing the incident with Operations Supervisor Rob Mirth. Yet at no point during that discussion did Glenn alert Mirth to Faust allegedly calling him a "boy" or goading him to "go ahead, do it." When asked why he failed to tell Mirth about these comments, he testified that he "honestly felt like it wouldn't matter to him . . . like he had his mind made up." Glenn Dep. 192:1-3. He further stated: "Honestly, I didn't say anything because I figured if they don't want to take the time to hear my side of the story to begin with,

---

[8]Glenn alleged, on the day after the altercation, that in the midst of "name-calling" during the March 20 altercation, Glenn told Faust to "say it to my face." Faust then allegedly approached Glenn and said, directly in front of his face, "go ahead, do it. I'm not going to get fired." This allegation, however, was not reported to management until after Glenn's termination. Upon learning of the allegation, Raymours immediately obtained a written statement from Faust in which he never mentions making this comment. Regardless, Glenn fails to explain how Faust's alleged comment is similar in nature to Glenn's "step outside" threat.

why would that matter? Why would they want to know that."  Glenn Dep. 190:23-191:3.  The

record offers no reason to believe that Mirth had made up his mind at that point, and Glenn

acknowledged that Mirth never told him that he had done so.  Having given no evidence, Glenn

cannot claim he was denied the opportunity to present his side of the story based on pure

speculation.

Even if Faust did call Glenn a "boy," which Faust denied in a written statement,[9] the two

individuals are still not similarly situated.  An employer could still reasonably believe that their

respective conduct—a racial epithet compared to a threat to fight—required different levels of

discipline.  See Johnson v. Barton House Convalescent Care, No. 99-3842, 2000 WL 1770661, at

*2 (7th Cir. Nov. 30, 2000) (finding lawful an employer's decision to terminate one employee

who threatened violence against a co-worker, even though that same co-worker used racial

epithets against the terminated employee and was not fired, because the employer "reasonably

could have perceived [the use of racial epithets] as less serious"); Ward v. Proctor & Gamble

Paper Products, 111 F.3d 558, 561 (8th Cir. 1997) (holding that two individuals were not similarly

situated because, in part, their actions during an argument "involved two separate levels of

escalation" and different types of conduct).  In sum, Raymours' treatment of Faust cannot raise an

inference of unlawful discrimination regarding Glenn's termination because there are

differentiating and mitigating circumstances that significantly distinguish both their conduct and

Raymours' treatment of them.

---

[9]Faust stated that when Glenn told him, "Be a man, let's take this outside," Faust responded, "I
am a man, you're acting like a boy."  Mirth, Corson, and Hazeldine all deemed Faust's statement
to be credible.

### ii.  Mike Adams and Liam Copperthwaite

In support of his disparate treatment claim, Glenn also seeks to compare himself to two other Caucasian Raymours employees, Mike Adams and Liam Copperthwaite.[10]  He asserts that Adams and Copperthwaite are similarly situated to him because: (1) they have the same supervisor, Chris Saporito, Raymours' Regional Director of Operations, and (2) Adams allegedly issued a threat of physical violence to Copperthwaite.

Regarding the same supervisor argument, Adams and Copperthwaite were employed in the Delivery Department, while Glenn worked in the Operations Department.  The managers of these departments were Eric Delaney and Don Hazeldine, respectively.  Both of these managers did report to Chris Saporito; however, they were responsible for the hiring, supervision, promotion, discipline, and firing of their employees.  Neither Delaney nor Hazeldine were required to report personnel decisions to the other, or seek approval from one another on hiring and firing decisions. Glenn argues that a genuine issue exists as to whether Saporito was actually the final decision-maker in these situations.  The only evidence Glenn cites in support of this argument is that Hazeldine informed Saporito via phone of his decision to terminate Glenn, and Delaney advised Saporito of his handling of the alleged Adams-Copperthwaite incident.  The record is clear though that, in dealing with these decisions, Hazeldine and Delaney made the decisions on how to proceed, and Saporito was advised of their decisions.  Hazeldine Dep. 19:9-13; 19:19-21; Delaney Dep. 41:6-9; 43:11-15.  Glenn has failed to provide any evidence to demonstrate that Hazeldine

---

[10]Although Glenn claims he is similarly situated to Copperthwaite, as well as Adams, Glenn's assertions regarding their alleged scuffle focus exclusively on Adams' actions, not Copperthwaite's conduct.  Therefore, Copperthwaite is irrelevant to this discussion.

was involved in the investigatory process related to the alleged Adams-Copperthwaite incident, or that Delaney participated in the decision to terminate Glenn.  Different supervisors from different departments made the decisions regarding these incidents.

Regardless of whether the three men reported to the same supervisor, they are still not similarly situated based on the "differentiating or mitigating circumstances" surrounding their respective altercations.  Critically, the underlying misconduct in Glenn's case was reported to Glenn's direct supervisors, confirmed by more than one witness, and admitted to by Glenn himself.  Adams' alleged misconduct is based strictly on the testimony of Robert Dye, an Operations Supervisor for Raymours.  Dye claims to have witnessed "the back end" of an altercation between Adams and Copperthwaite on Raymours' premises during which Adams, being separated from Copperthwaite by other individuals, told Copperthwaite he was going to "snap [his] F'ing [sic] neck" if he "ever [did] that again."  Dye was not Adams' supervisor, and he never reported what he saw or heard to Adams' supervisor, Eric Delaney.  Dye also could not recall when exactly this incident happened or the names of any individuals who would know any details about it.

Delaney, meanwhile, testified that as soon as he learned of a rumor regarding the alleged scuffle, he interviewed both Adams and Copperthwaite about the matter.  He interviewed Adams that same day, and Copperthwaite the day after.  He conducted a second set of interviews with both individuals a couple days later.  Neither Adams nor Copperthwaite admitted to having been engaged in any altercation.  Dye's allegations notwithstanding, Adams' alleged misconduct was not witnessed by Adams' direct supervisors, was not reported to those supervisors, and was not admitted to by Adams or Copperthwaite.  Therefore, the record is without sufficient evidence to

18

demonstrate that Adams or Copperthwaite are "similarly situated" to Glenn for purposes of establishing the fourth element of his prima facie case.

Because Adams, Copperthwaite, and Faust are not adequate comparators to Glenn, and Glenn fails to provide any other evidence to raise an inference of unlawful discrimination, I find that he has failed to establish his prima facie case of disparate treatment.[11]

## B. Pretext

Even assuming *arguendo* that Glenn has made out his prima facie case, his disparate treatment claim fails because he has produced insufficient evidence to raise a genuine issue of material fact as to whether Raymours' legitimate, non-discriminatory reason for terminating him was pretext for race discrimination.

"If the plaintiff establishes the elements of a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for its employment decision." Smith v. Borough of Wilkinsburg, 147 F.3d 272, 278 (3d Cir. 1998). The Third Circuit has commented that the employer's burden at this stage is "relatively light," and requires only an articulation of a legitimate reason for the unfavorable employment decision in question. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually*

---

[11]It should also be noted, as Raymours emphasizes, that the same person (Hazeldine) who terminated Glenn, hired him just eight months before, and that during that time, Hazeldine also provided Glenn with a favorable transfer and promotion. The Third Circuit has explained that such evidence, while not dispositive, may be relevant to demonstrate that discrimination did not play any part in an employer's termination decision." See Waldron v. SL Indus., Inc., 56 F.3d 491, 496 n.6 (3d Cir. 1995) (declining to apply the Fourth Circuit's presumption against discrimination where the hirer and firer are the same, but noting that "the defendant may of course argue to the factfinder that it should not find discrimination" based on such evidence).

motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id.

Rob Mirth documented the reason for Glenn's termination—"creating a hostile work environment and making threats to another associate"—in a "Disciplinary Counseling Form" on the same day as the incident. Def's. Mot. Summ. J. Ex. 19 at P01014-0105. Raymours' articulated reason is legitimate and non-discriminatory, and Glenn does not dispute this point. See Jeunes v. Potter, No. 08–cv-1218, 2009 WL 2883060, at **7-8 (D. Conn. Sept. 3, 2009) (finding that employer had legitimate, non-discriminatory reason for discharging plaintiff where plaintiff used profanity during an argument with a co-worker, told that co-worker to "step outside," and continued using profanity when plaintiff refused to "step outside"); Smith v. Hous. Auth. of Dauphin, No. 09-cv-765, 2010 WL 4916709, at *6 (M.D. Pa. Nov. 2, 2010) ("Inviting a co-worker to brawl," by asking that he "step outside," "is antithetical to the type of cooperative teamwork that [an employer seeks] to foster . . . .").

At the third stage of the McDonnell Douglas analysis, "the burden then reverts to the plaintiff to prove by a preponderance of the evidence that the articulated reason is a pretext." Smith, 147 F.3d at 278. This requires the identification of "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

As to the first evidentiary prong, "[t]he plaintiff can discredit the proffered reasons by 'demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable

factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons.'" Anderson, 621 F.3d at 277 (quoting Fuentes, 32 F.3d at 765). To show that race was more likely than not a motivating or determinative cause of the employer's action, "the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998) (citing Fuentes, 32 F.3d at 765). In reviewing whether a plaintiff has established pretext, a court must consider "the totality of the evidence," and not "the strength of each individual argument." Bray v. Marriott Hotels, 110 F.3d 986, 991 (3d Cir. 1997).

To establish that Raymours' reason for terminating Glenn was pretext, Glenn points to Raymours' purported failure to conduct meaningful investigations in the Glenn-Faust incident, Adams-Copperthwaite incident, and Cynthia Stinson incident. In support of this argument, Glenn cites numerous cases, all from outside the Third Circuit, in which courts considered the circumstances surrounding an investigation in weighing whether a plaintiff had established pretext. Critically, though, Glenn fails to explain how the investigations in those cases are similar to ones at issue here.

In Humphries v. CBOCS West, Inc., 474 F.3d 387 (7th Cir. 2007), for instance, a case cited by Glenn, the Seventh Circuit found that the employer's proffered reasons for firing the plaintiff were pretext, in part because the employer failed to interview the plaintiff regarding the veracity of the allegation levied against her, but simply credited a co-worker's version of the story.

474 F.3d 387 at 407.  Here, however, Raymours did not rely exclusively on Steven Faust's account of the March 20 altercation.  Raymours supervisor, Rob Mirth, went out and discussed the situation with Glenn, and gave him an opportunity to provide his side of the story.  Raymours also conducted formal interviews with Cynthia Stinson regarding the racially derogatory note she received on her desk, and Mike Adams and Liam Copperthwaite regarding their alleged scuffle.

In many of the other cases cited by Glenn, bias or coercive measures were involved. Glenn is not making any such allegation here, but merely arguing that Raymours should have formally interviewed more witnesses and timely obtained witness statements.  Yet Glenn can only speculate as to whether there were any witnesses to these incidents, and if so, whether they could have provided any beneficial information.[12]  Furthermore, the direct supervisors responsible for making the decisions regarding these incidents were all different.  Regardless, courts in the Third Circuit have found similar challenges to the adequacy of an investigation insufficient to establish pretext. See Money v. Provident Mutual Life Ins. Co., 189 Fed. Appx. 114, 116-17 (3d Cir. 2006) (finding plaintiff's "naked credibility attack" on the adequacy of an investigation insufficient to establish pretext); Geddis v. Univ. of Delaware, 40 Fed. Appx. 650, 653 (3d Cir. 2002) (finding that inadequate investigation is not sufficient to show an employer acted with discriminatory animus); Thomas v. Fairmount Behavioral Health System, No. 06-cv-523, 2007 WL 2306592, at *6 (E.D. Pa. Aug. 9, 2007) (finding insufficient evidence to establish pretext after considering plaintiff's argument that a "diligent investigation" did not occur); Reynolds v. Metro. Life Ins.

---

[12]In fact, at this point, the only witness to the Glenn-Faust incident—besides the three supervisors, Hazeldine, Mirth, and Corson—confirmed Faust's version of the story.  Pl.'s Res. Ex. 13 (email statement from Michelle Oteri).

<u>Co.</u>, No. 04-cv-232, 2007 WL 603012, at *6 (W.D. Pa. Feb. 22, 2007) (finding that "[e]ven if [defendant] conducted a flawed investigation . . . there is no indication that it was pretext for age discrimination").  The record, therefore, lacks sufficient evidence to demonstrate that Raymours' legitimate, non-discriminatory reason for terminating Glenn was pretext for racial discrimination.

Because Glenn has failed to present evidence raising a genuine issue of material fact as to whether race discrimination played a role in Raymours' decision to terminate him, I will grant Raymours' motion for summary judgment as to Glenn's Title VII, § 1981, and PHRA claims for disparate treatment.

## IV. CONCLUSION

For the foregoing reasons, I will grant Raymours' motion for summary judgment as to all of Glenn's claims.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to:

23